**IN THE COURT OF APPEALS OF IOWA**

No. 17-0874
Filed September 13, 2017

**IN THE INTEREST OF G.D. and A.D.,**
**Minor Children,**

**K.L., Custodian/Intervenor,**
　　　Appellant,

**VICKI R. DANLEY, Guardian ad litem,**
　　　Appellant.
_____


　　　Appeal from the Iowa District Court for Page County, Amy L. Zacharias,

District Associate Judge.


　　　The guardian ad litem and the custodian appeal from the juvenile court's

dispositional order, in which the court refused to waive the State's obligation to

provide reasonable efforts to reunify the family. **AFFIRMED.**


　　　Scott D. Strait, Council Bluffs, for custodian/intervenor.

　　　Vicki R. Danley, Sidney, guardian ad litem for minor children.

　　　William C. Bracker of Law Office of Bill Bracker, Council Bluffs, for mother.


　　　Considered by Vogel, P.J., and Potterfield and Mullins, JJ.

**POTTERFIELD, Judge.**

The guardian ad litem (GAL) and the custodian[1] of G.D. and A.D. appeal from the juvenile court's dispositional order, in which the court denied the GAL's motion to waive the State's obligation to make reasonable efforts to reunify the children with their parents. The GAL maintains there was substantial evidence of aggravated circumstances, pursuant to Iowa Code section 232.102(14)(b) and (c) (2017),[2] allowing the court to waive reasonable efforts for reunification. Additionally, if reasonable efforts are not to be waived, the GAL argues the department should not be required to allow visits between the children and the parents as parts of its reasonable-efforts mandate in this case.[3]

**I. Background Facts and Proceedings.**

This is not this family's first involvement with the Iowa Department of Human Services (DHS). A case was opened and services were provided in both 2014 and 2015; in both instances, the case was voluntarily dismissed by DHS. The present involvement began in July 2016, after both parents were observed to have fresh track marks on their arms and arrested. The father admitted to the arresting officer that both he and the mother had been using methamphetamine intravenously with the children present. At the time, G.D. was six years old and

---

[1] The custodian/intervenor is the children's paternal grandmother.

[2] At the time the GAL filed it and the district court decided it, the applicable subsections were 232.102(12)(b) and (c)—as opposed to 232.102(14)(b) and (c). Effective July 1, 2017, the subsections were renumbered. They are otherwise unchanged. For our own ease, we refer to the subsections under their current designation.

[3] The GAL argues the juvenile court should not have immediately ordered visitation as part of the reasonable-efforts mandate and instead should have waited until hearing testimony at the dispositional hearing to determine if visitation was in the children's best interests. It is unclear what remedy the GAL seeks for the visits that have already occurred; we consider the claim only insofar as it pertains to the future of the reasonable-efforts mandate.

A.D. was three years old. While the mother continues to maintain she did not use methamphetamine on that date, it is undisputed she allowed the father, who was high and hallucinating he was being chased, to take the children with him when he left in the family's vehicle. The mother did nothing to stop the father, and she did not summon help. Both parents were cited for felony child neglect.

As a result of the incident, the children were removed from the care of their parents and the State filed a petition alleging the children were children in need of assistance (CINA). Following an adjudicatory hearing, on October 12, 2016, the juvenile court found insufficient evidence to support the grounds for adjudication; the court ordered the CINA petition to be dismissed and the children to be returned to the care of their parents. However, there was a criminal no-contact order in place preventing the parents from having contact with the children, so the children's paternal grandmother took custody of the children through a guardianship.

The GAL appealed the dismissal of the CINA petition, and a panel of our court found sufficient evidence for both children to be adjudicated pursuant to Iowa Code section 232.2(6)(c)(2) and (n) (2016). *See In re G.D.*, No. 16-1895, 2017 WL 512796, at *2 (Iowa Ct. App. Feb. 8, 2017).

After procedendo issued, the juvenile court scheduled a dispositional hearing. The paternal grandmother, who was still the guardian of the children, filed a motion to intervene, and the juvenile court granted it. Additionally, the GAL filed a motion asking the court to waive reasonable efforts to reunify the children with their parents.

The dispositional hearing took place on April 21, 2017. The mother testified at the hearing, admitting she has struggled with the use of illegal drugs throughout much of her life and has previously had her parental rights terminated to other children. Testimony from the children's counselors and the social worker included statements of concern that the children had been traumatized a number of times over the preceding three years and were yet again suffering from instability.

The juvenile court found there was not clear and convincing evidence to establish aggravating circumstances and denied the GAL's motion to waive reasonable efforts. The court maintained the placement of the children with the paternal grandmother, and the permanency goal remained to reunify the children with the parents.

The GAL and the paternal grandmother appeal.

**II. Standard of Review.**

We perform a de novo review of dispositional orders in CINA cases. *In re K.B.*, 753 N.W.2d 14, 15 (Iowa 2008).

**III. Discussion.**

The GAL's motion to waive reasonable efforts alleged aggravating circumstances existed pursuant to section 232.102(14)(b) and (c). The section provides:

> 14. If the court determines by clear and convincing evidence that aggravated circumstances exist, with written findings of fact based upon evidence in the record, the court may waive the requirement for making reasonable efforts. The existence of aggravated circumstances is indicated by any of the following:
> . . . .

   b. The court finds the circumstances described in section 232.116, subsection 1, paragraph "i", are applicable to the child.
   c. The parent's parental rights have been terminated under section 232.116 or involuntarily terminated by an order of a court of competent jurisdiction in another state with respect to another child who is a member of the same family, and there is clear and convincing evidence to show that the offer or receipt of services would not be likely within a reasonable period of time to correct the conditions which led to the child's removal.

Iowa Code section 232.116(1)(i) states:
   (1) The child meets the definition of child in need of assistance based on a finding of physical or sexual abuse or neglect as a result of the acts or omissions of one or both parents.
   (2) There is clear and convincing evidence that the abuse or neglect posed a significant risk to the life of the child or constituted imminent danger to the child.
   (3) There is clear and convincing evidence that the offer or receipt of services would not correct the conditions which led to the abuse or neglect of the child within a reasonable period of time.

Here, the juvenile court determined there was not clear and convincing evidence the receipt of services would not be likely within a reasonable period of time to correct the conditions which led to the child's removal. We agree.[4]

A.D.'s counselor testified A.D. has been diagnosed with chronic post-traumatic stress disorder and attention deficit hyperactivity disorder. She also testified he has suffered trauma when he lived with his mother in the past and he is currently working through that trauma with art therapy and play therapy. His anxiety worsened when visits with the mother restarted in February 2017. However, the counselor did not opine that A.D. should not have visits with his

---

[4] We note that A.D. and G.D. have been removed from both parents' care and the GAL's initial motion did not specify that it was asking the court to waive reasonable efforts only as to the mother. However, all of the testimony focused on the mother's relationship with the children—presumably because it is the paternal grandmother who is currently guardian of the children.

mother or be returned to her care. When asked how long A.D. should continue to participate in therapy, she testified:

> You know, individual therapy is not—it's going to be a good thing for him ongoing for a while just to kind of deal with all of the past trauma he has had. If something happens that he is going to be placed back in [the mother's care], I would hope that several services continue, whether it be [behavioral health intervention services], therapy, maybe family therapy in the future, so that we are not just jumping the gun and the kids are going back. There needs to be small baby steps.

G.D.'s counselor testified about similar concerns regarding past trauma G.D. had suffered while in his mother's care, including issues with hunger and unsanitary home conditions. She stated he has been able to process some of that trauma and refers to himself as happy when talking about visits with his mother. When asked how long G.D. would need therapy, his counselor testified, "I think we have a ways out. [Six] months to a year wouldn't be uncommon, especially given his speech issues. His vocabulary is increasing, but it has a long ways to go." G.D.'s counselor did not testify that visits between G.D. and the mother were hurtful to G.D., and she did not testify that it would harm G.D. tor reunify with his mother.

The family's social worker was also assigned to their 2014 and 2015 cases. She testified she participated in and "signed off" on the department's previous two decisions to voluntarily dismiss the family's cases, meaning she "believe[d] we ha[d] achieved safe closure." When asked about her concerns that the family was again involved with DHS for the third time in three years and her obligation to recommend the children reunify with the parents, she testified:

> I think that's pretty—honestly when I have a case come back through the Department of Human Services, of course, I look at the

Department's role. I look at my role. I look at did I make the right decision as a supervisor, did we miss something, did we not provide something that's support to this family that might have helped. I think in the totality of it, of course I should look at that. That's an ethical responsibility of being a supervisor for the Department. Hence that's part of the reason I'm going to keep this case. Because I want my eyes on it only. It's concerning to me because it seems to be a mom—and everything I am saying, mom and dad and I have already talked about. When mom and dad have close supervision and external control—and what I mean by that is like the Department, [Family Safety, Risk, and Permanency] (FSRP), juvenile court—they do textbook beautiful. I will say that when I have observed the children's visits with their parents—and I have done that since the case came back—I would say probably it's the best parenting skills I have ever seen in [twenty-six] years of doing child welfare work.

My concern is when those external controls go away and the eyes go away, mom and dad—and I have heard a lot of testimony today really focusing on mom. One of the things I want to make sure of today as I'm testifying, it's not just mom. Dad was using methamphetamine as well and . . . the children have also confronted him during visits that I have been at about mom and you using drugs again.

I feel for these kids that reunification occurs, DHS and juvenile court goes away, and then we come back to the same issues. I think that pattern leads to the anxiety and the trauma and just that—those feelings of distrust that they have.

We understand the social worker's testimony to mean she has concerns that the parents are able to appear to have made significant changes or growth when they, in fact, have not. In light of the history of DHS's involvement with this family, such concerns are valid. But those concerns do not establish that the parents are unable to actually make those changes when offered services and held accountable.

While both counselors testified about the children's fear of further instability in their lives, neither opined that eventually returning the children to their parents would be detrimental to the children. Additionally, the social worker and FSRP provider were asked to rate the mother's motivation to accept services

and implement suggestions on a scale from one to ten, and both gave her a "ten." There is not clear and convincing evidence that the receipt of services will not allow for the reunification of this family within a reasonable time. And nothing in the record suggests that future visits between the children and the mother would harm the children. *See In re M.B.*, 553 N.W.2d 343, 345 (Iowa Ct. App. 1996) ("The reasonable efforts concept would broadly include a visitation arrangement designed to facilitate reunification while protecting the child from the harm responsible for the removal."); *cf. In re C.M.*, No. 03-1988, 2004 WL 240300, at *1–2 (Iowa Ct. App. Feb. 11, 2004) (noting "[t]he nature and extent of visitation is controlled by the best interests of the child[ren]" and finding visitation was not a necessary component of reasonable efforts when the father was uncooperative, did not see any to reason to change, and acted in a manipulative and intimidating manner).

For these reasons, we affirm the juvenile court's dispositional order.[5]

**AFFIRMED.**

---

[5] That is not to say that we do not share some of the GAL's and custodian's concerns the mother has failed to take responsibility for the trauma suffered by the children. Both of the counselors testified the children have reported traumatic issues involving lack of cleanliness in the home—including bugs, going hungry, and seeing the "pee pee" of one of the mother's "friends." The mother attempted to imply the children have been coached by their paternal grandmother to discuss such issues, but both counselors testified they have seen no signs of coaching. *See In re C.H.*, 652 N.W.2d 144, 150 (Iowa 2002) (noting the State may require a parent to admit past transgressions insofar as the parent is required to obtain meaningful treatment for their problems, and "[a] parent's failure to address his or her role in [the harm suffered by the children] may hurt the parents' chances of regaining custody and care of their children").